Katherine Johnson (DC Bar No. 497321)
kjohnson3@ftc.gov
FEDERAL TRADE COMMISSION
600 Pennsylvania Ave. NW, CC-9528
Washington, DC 20580
Tel:  (202) 326-2185

Thomas Syta, Cal. Bar No. 116286
tsyta@ftc.gov
FEDERAL TRADE COMMISSION
10877 Wilshire Blvd., Suite 700
Los Angeles, CA 90024
Tel: (310) 824-4343; Fax:  (310) 824-4380

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SANTA ANA DIVISION

| | |
|---|---|
| **In re:**<br><br>DAMIAN ROBERT KUTZNER<br><br>Debtor | Case No.8:17-bk-11895-ES<br><br>**CHAPTER 7** |
| FEDERAL TRADE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>DAMIAN KUTZNER<br><br>Defendant. | Adversary No.<br><br>COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT OWED TO FEDERAL TRADE COMMISSION<br><br>(Hearing date to be set by summons) |

The Federal Trade Commission ("FTC" or "Commission") brings this adversary proceeding pursuant to 11 U.S.C. § 523(a)(2)(A), (a)(6), and (c) seeking an order determining that a judgment in its favor against Defendant Damian Robert Kutzner ("Debtor," "Defendant," or "Kutzner") is excepted from discharge.

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334, and 11 U.S.C. § 523. This Adversary Proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

2.      Venue in the Central District of California is proper under 28 U.S.C. § 1409(a).

3.      This Adversary Proceeding relates to *In re Damian Robert Kutzner*, Case No. 8:17-bk-11895, a Chapter 7 case now pending in this Court ("Bankruptcy Case"). The FTC seeks to except from discharge an $18,376,499.15 contempt sanction against Kutzner arising from his violation of an order entered in a consumer protection case styled *FTC v. GM Funding Inc., et al.*, No. Case No. SACV 02-1026 DOC (MLGx) (C.D. Cal.) (Carter, J.) , Stipulated Order Modifying the Stipulated Judgment and Order for Permanent Injunction as to Defendants GM Funding Inc., Robert D. Kutzner, Global Mortgage Funding Inc., and Damian R. Kutzner, DCt ECF No. 96 (Jan. 9, 2017) ("Contempt Order and Judgment"), **FTCX 1**. The Judgment also includes injunctive and other equitable relief, which has not been stayed by Debtor's bankruptcy filing.

4.      Plaintiff FTC consents to entry of a final judgment by the Court in this proceeding.

## THE PARTIES

5.      Plaintiff FTC is the United States agency that protects consumers by enforcing the FTC Act, 15 U.S.C. §§ 41-58, which prohibits deceptive trade practices. 15 U.S.C. § 45(a). The FTC Act authorizes the Commission to file suit in federal district court to enjoin violations of the statute and obtain other equitable

relief, including rescission of contracts and restitution and disgorgement of ill-gotten gains.  15 U.S.C. § 53(b).  The Commission may also seek contempt sanctions to compensate consumers for violations of orders in such cases.

6.     Defendant is the Debtor in the Bankruptcy Case, now pending before this Court.  Kutzner was a founder and the Chief Operating Officer of Brookstone Law P.C.[1], and a principal or controlling person of Advantis Law P.C.[2]  Kutzner, in connection with the matters alleged herein, has transacted business in this district.

### PRIOR PROCEEDINGS AND DEFENDANT'S DECEPTIVE AND CONTUMACIOUS CONDUCT GIVING RISE TO THE NONDISCHARGEABLE DEBT

**A.     The 2002 Proceeding and 2003 Order**

7.     The FTC first filed suit against Kutzner in 2002 in the case styled *FTC v. GM Funding Inc., et al.*, No. Case No. SACV 02-1026 DOC (MLGx) (C.D. Cal.) ("2002 Proceeding").  As alleged in its 2002 complaint, Kutzner engaged in a deceptive and unfair email spamming scheme.  His companies spammed consumers from email addresses similar to banks and other legitimate enterprises, including Radian Group Inc., Radian Guaranty Inc., Prudential Inc., and the Fannie Mae Corporation.  These emails prompted consumers to go to websites where they would then disclose their name, address, phone number, email address, and mortgage details.  Kutzner's companies would then solicit these consumers for mortgages and mortgage refinancing.

8.     To resolve the allegations, Kutzner stipulated to the entry of an order, which imposed a permanent injunction.  Stipulated Judgment and Order for

---

[1] "Brookstone" includes both the California and identically named Nevada companies.
[2] "Advantis" includes both Advantis Law P.C. and Advantis Law Group P.C., unless otherwise noted.

Permanent Injunction as to Defendants GM Funding, Inc., Robert D. Kutzner,
Global Mortgage Funding, Inc., and Damian R. Kutzner (May 5, 2003) (the "2003
Order"), 2002 Proceeding DCt ECF No. 36, **FTCX 2**.  The injunction prohibited
Kutzner from, among other things, "making any express or implied
misrepresentation or omission of material fact that is false or misleading, in any
manner, directly or indirectly, to any consumer or entity. . . ."  2003 Order, Section
II.  Both Kutzner and his counsel signed and stipulated to the 2003 Order.  *Id.* at
14.

9.     As more fully described below, Kutzner has continued to operate
deceptive businesses in violation of the 2003 Order.

**B.     The 2016 FTC Action**

10.     On May 31, 2016, the FTC filed a *de novo* action against Kutzner
alleging violations of the FTC Act and Mortgage Assistance Relief Services Rule
("MARS Rule"), 16 C.F.R. Part 322, recodified as Mortgage Assistance Relief
Services, 12 C.F.R. Part 1015 ("Regulation O"), related to fraudulent mortgage
assistance relief services ("FTC Action").[3]  Kutzner's co-defendants in the FTC
Action included the companies Brookstone Law P.C. (Nevada and California),
Advantis Law P.C., and Advantis Law Group P.C.  The other original individual
defendants were the enterprise's "lawyers," Vito Torchia, Jr., Jonathan Tarkowski,
R. Geoffrey Broderick, and Charles T. Marshall (collectively, "FTC Action Co-

[3] Kutzner was also a defendant in another action brought by the Depart of Justice
on behalf of the FTC, *U.S. v. Global Mortgage Funding, Inc.*, SACV07-1275 DOC
(C.D. Cal.).  Kutzner also entered into a Stipulated Judgment and Order for
Permanent Injunction (July 17, 2009) (the "2009 Order").  The FTC did not file a
contempt motion under the 2009 Order; only the United States, through the
Department of Justice, can seek contempt under that order.  Nonetheless, as
described herein, Kutzner was plainly violating the 2009 Order's telemarketing
ban.

defendants"). All defendants in the FTC Action, including Kutzner, were named individually and as officers of Brookstone or Advantis. In July 2016, the FTC filed an amended complaint to add Jeremy Foti as a defendant, alleging that he, like Kutzner, was a non-lawyer with control over the enterprise.

11. From 2009 to 2010, Kutzner operated ULG, a mortgage assistance "law firm" that offered advance-fee loan modifications. In October 2009, California outlawed advance-fee loan modifications, with no attorney exemptions. CA. Civ. Code § 2944.7. Simultaneously, ULG faced numerous allegations that its two primary lawyers committed mortgage modification fraud. Both attorneys were then disbarred, and ULG was raided by the FBI and the United States Postal Inspectors. ULG was dissolved following the investigation and raid.

12. Kutzner has since pled guilty to criminal charges related to his management of ULG.

13. Beginning around 2011, after ULG unraveled, Kutzner and his FTC Action Co-defendants advertised, marketed, promoted, sold, and/or offered to sell mortgage assistance relief services through Brookstone. Kutzner and his FTC Action Co-defendants presented themselves as experienced lawyers and law firms that included experienced litigators who would quickly, or without delay, file and actively pursue lawsuits against lenders on consumers' behalf. They targeted distressed homeowners, many of whom had fallen behind on their mortgage payments, and convinced them to purchase legal services by telling the consumers that they were likely to prevail in lawsuits against their lenders. Often Kutzner and his FTC Action Co-defendants told consumers they would receive at least $75,000 by suing their lender. They then extracted thousands of dollars in upfront fees. In return, they provided little or nothing.

**Kutzner and his Cohorts Targeted Vulnerable Homeowners With Mass
Mailers Hawking Their Mortgage Assistance Relief Services**

14.    Kutzner and his FTC Action Co-defendants preyed on distressed
homeowners.  They identified consumers at risk of foreclosure and targeted them
with individualized mortgage assistance relief services, including mass joinder
lawsuits to void mortgage notes and other actions to stop foreclosures.

15.    One letter, sent to consumers around May 2012, says, "You may
become a joined named plaintiff in a significant lawsuit that will seek, among other
things, to void your note(s)."

16.    Another letter, sent to consumers around August 2015, states,
"Brookstone Law is preparing to sue the trustee assigned to foreclose on your
property for wrongful foreclosure and demand that they immediately cancel your
auction date."

17.    The marketing materials portrayed Kutzner's companies' legal
practitioners with the resources and experience to successfully litigate complicated
mass joinder cases.  For example, in a May 2012 letter, Brookstone claimed that its
"team of lawyers . . . has substantial experience in lender fraud and related claims."
It also claimed that "our team of experienced lawyers offers you a superior
alternative for recovery."

18.    Kutzner and his FTC Action Co-defendants further promoted the
companies' litigation experience by telling consumers "[i]t may be necessary to
litigate your claims against your lender to get the help you need and our lawyers
know how to do so."

19.    Kutzner and his FTC Action Co-defendants told consumers that they
could become a plaintiff in a significant litigation seeking "to void your note(s), to
give you your home free and clear, and/or to award you relief and monetary
damages."

5

20.    Kutzner and his FTC Action Co-defendants' marketing materials urged homeowners to act quickly and call Defendants in order to preserve their legal options.

21.    For example, the May 2012 letter reads, "You should act now! Waiting may eliminate or reduce the many options you have available." The letter goes on to say, "We encourage you to take prompt action by contacting us before 05/12/2012."

22.    Similarly, an August 2015 letter identifies a recent California Supreme Court decision and tells consumers, "**URGENT the above decision will NOT stop the sale of your home so you MUST contact us now . . . <u>Your home will be sold at Auction unless you take immediate action.</u>**" Further, below the letter emphasizes "*Scheduled Trustee Auction Date*: **8/26/2015**".

23.    Both the May 2012 and August 2015 letters were individually tailored for specific consumers. For example, the May 2012 letter was addressed to the homeowner by name, and contains at the bottom a table with the homeowner's name, a "Client Case ID#," the homeowner's total loan amount, the homeowner's parcel ID, and the property zip code. The August 2015 letter was also addressed to the homeowner by name, followed by a "Client ID #." The letter includes the name of the homeowner's mortgage lender, followed by the homeowner's name and address.

24.    Nowhere in the May 2012 or August 2015 letters did Kutzner and his FTC Action Co-defendants include any of the following disclaimers:

a.    "You may stop doing business with us at any time. You may accept or reject the offer of mortgage assistance we obtain from your lender [or servicer]. If you reject the offer, you do not have to pay us. If you accept the offer, you will have to pay us [amount or method for calculating the amount] for our services";

      b.  "[Brookstone or Advantis] is not associated with the government, and our service is not approved by the government or your lender"; or

      c.  "Even if you accept this offer and use our service, your lender may not agree to change your loan."

25.    Kutzner and his FTC Action Co-defendants likewise did not include such disclaimers in the other, similar letters that they sent to homeowners.

26.    In addition to consumer-specific communications, Kutzner and his FTC Action Co-defendants also solicited business from distressed homeowners through websites advertising Brookstone and Advantis:  www.brookstonelaw.com, www.advantislaw.com.

27.    For example, the Brookstone website trumpeted its experience, stating, "This is an important announcement for anyone in America who currently is in danger of losing their home due to foreclosure or other related action of their lender.  There is help available for you now.  Brookstone Law has a team of experienced litigation attorneys that can help people victimized by violations where banks, loan servicers, or others have taken advantage of honest homeowners."

28.    Although purportedly separate law firms, both Brookstone and Advantis advertised the same services on their websites, in many instances using identical language.

29.    Both the Brookstone and Advantis websites used identical language in describing their real estate legal services, each claiming:  "Every transaction in the world of real estate is essentially a contract negotiation and a business transaction. At the same time there is often a strong element of emotion involved in real estate ownership and possession. . . . We proceed with decisiveness while exercising caution as necessary to avoid litigation and resolve disputes in the most expeditious, beneficial way for our clients."

30.     Both the Brookstone and Advantis websites touted the mass joinder suit *Wright v. Bank of America* as their own.  Both websites use the same description for the case:  "This lawsuit arises from:  (1) Defendants' deception in inducing Plaintiffs to enter into mortgages from 2003 through 2008 with the Countrywide Defendants; (2) Defendants' breach of Plaintiffs' Constitutionally and statutorily protected rights of privacy; and (3) Defendants' continuing tortious conduct intended to deprive Plaintiffs of their rights and remedies for the foregoing acts."

31.     Nowhere on their websites did Kutzner and his FTC Action Co-defendants include any of the following disclaimers:

    a.  "[Brookstone or Advantis] is not associated with the government, and our service is not approved by the government or your lender"; or

    b.  "Even if you accept this offer and use our service, your lender may not agree to change your loan."

32.     In all of these communications, Kutzner and his FTC Action Co-defendants encouraged homeowners to contact them through one of their toll-free numbers.

**When Consumers Responded to the Mass Mailers, Kutzner and His FTC Action Co-Defendants Promised Consumers Lawsuits and Favorable Results**

33.     Once homeowners called Kutzner and his FTC Action Co-defendants, sales representatives convinced them that they were signing up for lawsuits, and that by so doing they would achieve favorable results.

34.     Kutzner and his FTC Action Co-defendants' main products were "mass joinder" lawsuits against the homeowners' mortgage lender.  These lawsuits join dozens, or even hundreds, of individual plaintiffs in a single action against a particular lender.  These are not class action lawsuits.  Each individual plaintiff's

8

claim must be separately proven and, in the event of a trial, each individual plaintiff would have a separate trial. For example, Kutzner and his FTC Action Co-defendants filed *Wright v. Bank of America* on behalf of over 900 plaintiffs asserting unique claims. As alleged, they shared some factual overlap, such as the alleged fraud on the market to drive up home prices, but do not share any other particulars, each of which would need to be proven for a specific plaintiff to prevail. The FTC Action Co-defendants filed similar suits against a number of other banks, including CitiGroup, JP Morgan Chase, Wells Fargo, Ally Bank, OneWest Bank, and Ocwen Financial Corporation.

35. On numerous occasions, Kutzner and his FTC Action Co-defendants presented these lawsuits as, among other things, ways to delay foreclosures, negotiate loan modifications, or obtain forbearance on mortgage payments. For example, one consumer was told that because his claim was worth $75,000 the bank would seek to renegotiate the loan amount.

36. Kutzner and his FTC Action Co-defendants' offers included unsupported assessments about the likelihood of success. Such assessments started with a homeowner's very first conversation with a telemarketer—non-lawyers charged with collecting the homeowner's information.

37. Once telemarketers convinced homeowners to come into Kutzner's and his FTC Action Co-defendants' offices for in-person meetings, they gave homeowners further assessments of their likelihood of success in the mass joinder cases.

38. During these initial meetings, Kutzner and his FTC Action Co-defendants told consumers they needed to perform a "legal analysis" to evaluate the viability of a claim against their mortgage holder. Consumers paid Kutzner and his FTC Action Co-defendants $895, and sometimes more, before they would conduct their "legal analysis."

9

39.     On numerous occasions, Kutzner and his FTC Action Co-defendants then provided homeowners a "legal analysis," stating that the fraud in their mortgage paperwork was obvious.  Kutzner and his FTC Action Co-defendants told such homeowners that they were likely, or even certain, to prevail, if they retained them for a mass joinder suit against their lender.  On numerous occasions, Kutzner and his FTC Action Co-defendants told homeowners that they would recover "at least $75,000."

40.     Additionally, Kutzner and his FTC Action Co-defendants told consumers they would quickly file a lawsuit and actively litigate on their behalf.

41.     Although Kutzner and his FTC Action Co-defendants' mass joinder litigations are purportedly "contingency fee" actions, Kutzner and his FTC Action Co-defendants collected both upfront fees and continuing payments from consumers.  Kutzner and his FTC Action Co-defendants charged homeowners a recurring monthly fee to maintain their status as named plaintiffs.

42.     Kutzner and his FTC Action Co-defendants received at least $15 million through 2014.

43.     Kutzner and his FTC Action Co-defendants did not deposit payments in client trust accounts, as required by law.  Instead, they treated these funds as if they were fully earned, and used them for expenses as they received them.

44.     On numerous occasions, homeowners asked for refunds for amounts paid because they had received no service or benefit.  On many of these occasions, Kutzner and his FTC Action Co-defendants refused homeowners' requests.

**Kutzner and his FTC Action Co-Defendants Did Not Deliver Promised Outcomes or Quickly File Lawsuits**

45.     Kutzner and his FTC Action Co-defendants' promises to quickly file lawsuits that would provide homeowners substantial monetary awards, lower mortgages, or voided notes had no reasonable relationship with any actual services they provided or outcomes they achieved for homeowners.

46.     Kutzner and his FTC Action Co-defendants never won a single mass joinder lawsuit on the merits.

47.     Far from the certainty of winning "at least $75,000," and possibly obtaining their homes free and clear of any mortgage, Kutzner and his FTC Action Co-defendants did not even seek such relief.  In fact, as early as February 2012, Kutzner and his FTC Action Co-defendants tried to avoid federal court jurisdiction by arguing on their clients' behalf that they were, in fact, not seeking to void their clients' notes or obtain their clients' homes free and clear.  Eleven of the twelve Brookstone mass joinder cases filed before 2016 were dismissed.  In March and April 2016 Kutzner and his FTC Action Co-defendants filed three more mass joinder cases.

48.     Brookstone's mass joinder cases have been dismissed for varied reasons, including for lack of prosecution, for misjoinder, on demurrer, and on voluntary dismissal.  Of their original cases, the only surviving case is *Wright v. Bank of America*, No. 30-2011-449059 (Sup. Ct. Cal. Orange County).  No court has spoken to the merits of the claims in that lawsuit.  Initially dismissed for misjoinder, the California Court of Appeals allowed it to proceed in spite of its "desultory and scattered allegations," but required Kutzner and his FTC Action Co-defendants to replead the Complaint into an intelligible pleading.  *Wright v. Bank of America*, 232 Cal. App. 4th 238, 254 (2014), review denied (Mar. 25, 2015).  It then took Kutzner and his FTC Action Co-defendants almost ten months to file their fourth amended complaint in January 2016; Brookstone told the court it would need to amend its complaint again.  Kutzner and his FTC Action Co-defendants never took any affirmative steps to prosecute these cases.  Instead, they did minimal work, only sometimes responding to demurrers, while filing amended complaints adding additional consumers they have signed up.  They did not pursue discovery in their cases, either not seeking discovery or agreeing to stays of

11

discovery.  In several instances, they voluntarily dismissed the cases without prejudice and never refiled the cases to pursue their paying clients' claims.

49.     Kutzner and his FTC Action Co-defendants did not perform the tasks that they promised their clients they would undertake.  For example, on numerous occasions, Kutzner and his FTC Action Co-defendants told homeowners that they would add them as plaintiffs to mass joinder cases, but never did so.  On numerous other occasions, Kutzner and his FTC Action Co-defendants told homeowners they would be added to lawsuits shortly, but months passed before they were added.

50.     Kutzner and his FTC Action Co-defendants did not communicate with clients or respond to client requests about how they were litigating the clients' case.  Numerous clients repeatedly asked for updates regarding how their case was proceeding and received no response whatsoever.  When Brookstone vacated its offices in late 2014, Kutzner and his FTC Action Co-defendants refused to tell clients the location of its new office; then, when pressed, lied to its clients about where its offices were located.

51.     Kutzner and his FTC Action Co-defendants did not tell clients that their lawsuits had been dismissed and continued collecting monthly fees.  Often clients determined on their own that their cases had been dismissed.

52.     In August 2014, the California Bar court found Torchia, Brookstone's then-lead lawyer, had violated his ethical duties to his clients with respect to provision of mortgage-related services, including 16 counts of misconduct, such as failure to perform legal services with competence, failure to maintain records of client funds and render appropriate accounts to the client, failure to return unearned funds, and failure to return client papers/property.

53.     During his ethics trial, Torchia testified he did not have the experience to be lead counsel on the mass joinder cases.  He further conceded that Brookstone failed to provide the most basic elements of legal representation, including

properly communicating with clients, adequately explaining what consumers should expect from the representation, and returning unearned fees.

54.    Confirming Torchia's own admissions, the California Bar court found that Torchia "lacked and continue[d] to lack the law-office-management skills and basic knowledge of mortgage lending law and bankruptcy law necessary to adequately and properly represent some 4,000 mortgage loan clients." (Emphasis supplied.)

55.    Similarly, Tarkowski did not have any relevant experience, let alone experience litigating complicated fraud cases on behalf of several hundred separate plaintiffs.

56.    Contrary to Kutzner and his FTC Action Co-defendants' claims that they knew how to obtain the promised results and had the ability to pursue these claims, they in fact did not have any attorneys on staff with the relevant experience or sufficient resources to simultaneously litigate hundreds or thousands of fraud cases.

## C.    2016 Contempt Proceedings

57.    Based on the course of conduct described above, the FTC concurrently filed an order to show cause why Kutzner should not be held in contempt for violating the 2003 Order.  2002 Proceeding DCt ECF No. 39, Plaintiff's Notice and Application for an Order to Show Cause Why Kutzner Should Not Be Held in Contempt, filed June 27, 2016 ("Contempt Application").

58.    To resolve the allegations in both the Contempt Application and the 2016 FTC Action, the FTC and Kutzner entered into the stipulated Contempt Order and Judgment, which dismissed Kutzner as a defendant in the 2016 FTC Action, and entered a modified permanent injunction and monetary judgment in the 2002 Proceeding in the amount of $18,376,499.15.  The Contempt Order and Judgment also includes injunctive and other equitable relief.

59.    As part of the Contempt Order and Judgment, Kutzner further agreed that the Judgment was not dischargeable in bankruptcy and agreed that the facts alleged in the Contempt Application are true, without further proof, in any subsequent litigation, including a nondischargeability action in any bankruptcy case.  Contempt Order and Judgment, V.B.

60.    Kutzner further stipulated that the facts alleged in the Contempt Application establish all of the elements necessary to establish nondischargeability of the Judgment under 11 U.S.C. § 523(a)(2)(A), and that the order would have collateral estoppel effect for such purposes.  *Id.*, V.C.

## COUNT I

### (NONDISCHARGEABLE DEBT FOR MONEY OBTAINED BY FALSE PRETENSES, FALSE REPRESENTATIONS OR ACTUAL FRAUD)

61.    The Commission repeats and realleges the allegations in ¶¶ 1 through 60.

62.    Debts for money, property, or services obtained by false pretenses, a false representation or actual fraud are not dischargeable.  11 U.S.C. § 523(a)(2)(A).

63.    In connection with the advertising, marketing, promotion, offering for sale, or sale of mortgage assistance relief services, Kutzner and his FTC Action Co-defendants, or their agents falsely represented, directly or indirectly, expressly or by implication, that:

> A.    Kutzner and his FTC Action Co-defendants were likely to obtain relief for consumers, including in some instances "at least $75,000" or consumers' homes free and clear;
>
> B.    Kutzner and his FTC Action Co-defendants s would seek to void consumers' mortgages;

C.    Kutzner and his FTC Action Co-defendants had a team of experienced lawyers and personnel to litigate mass joinder cases alleging lender fraud and related claims on behalf of hundreds or thousands of clients simultaneously; and

D.    Kutzner and his FTC Action Co-defendants would file lawsuits on particular consumers' behalf.

64.    In connection with the advertising, marketing, promotion, offering for sale, or sale of mortgage assistance relief services, Kutzner and his FTC Action Co-defendants, or their agents failed to make the following disclosures:

A.    In general commercial communications:

i.    "[Brookstone or Advantis] is not associated with the government, and our service is not approved by the government or your lender," in violation of the MARS Rule and Regulation O, 16 C.F.R. § 322.4(a)(1), 12 C.F.R. § 1015.4(a)(1); and

ii.    "Even if you accept this offer and use our service, your lender may not agree to change your loan," in violation of the MARS Rule and Regulation O, 16 C.F.R. § 322.4(a)(2), 12 C.F.R. § 1015.4(a)(2).

B.    In consumer-specific commercial communications:

i.    "You may stop doing business with us at any time. You may accept or reject the offer of mortgage assistance we obtain from your lender [or servicer]. If you reject the offer, you do not have to pay us. If you accept the offer, you will have to pay us [amount or method for calculating the amount] for our services," in violation of the MARS Rule and Regulation O, 16 C.F.R. § 322.4(b)(1), 12 C.F.R. § 1015.4(b)(1);

ii.     "[Brookstone or Advantis] is not associated with the government, and our service is not approved by the government or your lender," in violation of the MARS Rule and Regulation O, 16 C.F.R. § 322.4(b)(2), 12 C.F.R. § 1015.4(b)(2); and

iii.     "Even if you accept this offer and use our service, your lender may not agree to change your loan," in violation of the MARS Rule and Regulation O, 16 C.F.R. § 322.4(b)(3), 12 C.F.R. § 1015.4(b)(3).

65.     The course of conduct described above and in ¶¶ 1 through 60 constitutes deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. §45(a), and in violation of the MARS Rule and Regulation O, 16 C.F.R. § 322.3(b), 12 C.F.R. § 1015.3(b).

66.     Kutzner and his FTC Action Co-defendants conducted the activities described in ¶¶ 1 through 60 with knowledge that they were engaged in a fraudulent scheme, and with the knowledge of the falsity or deceptive omissions and misrepresentations in the course of that scheme, or with reckless disregard for the truth or falsity of the misrepresentations and omissions, and with an intent to deceive consumers.

67.     Kutzner and his FTC Action Co-defendants injured consumers by knowingly engaging in a fraudulent scheme and knowingly making false representations and deceptive omissions to consumers and using false pretenses in dealing with consumers.

68.     These false representations and false pretenses and deceptive omissions were material to consumers in the course of deciding to purchase products and services offered by Defendant and his FTC Action Co-defendants. Consumers' reliance on Defendant's and his FTC Action Co-defendants' omissions and misrepresentations was justifiable.

69.     The total amount of money obtained from consumers by such false

representations and false pretenses or actual fraud is at least $18,376,499.15, the monetary portion of the Contempt Order and Judgment entered against Defendant in the Contempt Action.

70. Consequently, the Judgment is a debt owed to the FTC for money, property, or services obtained by false representations, false pretenses, or actual fraud, and is excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A).

## COUNT II

### (NONDISCHARGEABLE DEBT FOR WILLFUL AND MALICIOUS INJURY)

71. The Commission repeats and realleges the allegations in ¶¶ 1 through 60.

72. Debts for willful and malicious injury by a debtor to another entity or to the property of another entity are not dischargeable. 11 U.S.C. § 523(a)(6).

73. Defendant's contumacious conduct giving rise to the Contempt Order and Judgment was willful.

74. In connection with the advertising, marketing, promotion, offering for sale, or sale of mortgage assistance relief services, Defendant intentionally, deliberately and knowingly made false representations and deceptive omissions to consumers and used false pretenses in dealing with consumers, in violation of Section II of the 2003 Order.

75. The purpose of Section II of the Consent Order was to prevent Defendant from injuring consumers. Defendant's violation of that injunction was intentional, and injury to consumers was substantially certain to and did occur because of his contumacious conduct.

76. Defendant's contumacious conduct was malicious.

77. Defendant engaged in this conduct without just cause or excuse and his conduct resulted in $18,376,499.15 in consumer injury.

78. Thus, the Contempt Order and Judgment is a debt owed by Defendant

17

to the FTC for willful and malicious injury by the debtor to another entity or to the property of another entity, and is excepted from discharge pursuant to 11 U.S.C. § 523(a)(6).

## COUNT III

### (COLLATERAL ESTOPPEL/ISSUE PRECLUSION)

79.    Plaintiff FTC repeats and realleges the allegations in ¶¶ 1 through 60.

80.    Defendant was a contempt defendant in the Contempt Application filed in the 2002 Proceeding, and he actually litigated the Contempt Order and Judgment.

81.    The Contempt Application ended with a final judgment on the merits against Defendant.

82.    The issues underlying the FTC's contempt claims against Defendant in the FTC Contempt Application are identical to the issues underlying the FTC's claim in this action that the judgment is excepted from discharge under 11 U.S.C. § 523(a)(2)(A) and (a)(6).

83.    Defendant specifically agreed in the Stipulated Order that the facts as alleged in the complaint in the Contempt Application shall be taken as true, without further proof, for the purpose of any action to collect the judgment, including, but not limited to, a nondischargeability complaint in any bankruptcy case. Contempt Order and Judgment ¶ V.

84.    Accordingly, Defendant is collaterally estopped from relitigating the facts alleged in this Complaint.

WHEREFORE, plaintiff FTC requests that the Court:

(a) Determine that: (1) Debtor is collaterally estopped from relitigating the facts alleged in this Complaint, and (2) the pre-petition debt owed by Debtor to the FTC pursuant to the Contempt Order and Judgment entered by the United States

District Court for the Central District of California, in the case styled *FTC v. GM Funding Inc., et al.*, No. Case No. SACV 02-1026 DOC (MLGx) (C.D. Cal.) (Carter, J.), in the principal amount $18,376,499.15, plus applicable interest pursuant to 28 U.S.C. § 1961, is nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A) and (a)(6); and

(b) Grant the FTC such other and further relief as this case may require and the Court deems just and proper.

Respectfully submitted,

Dated:  November 13, 2017   /s/ Katherine Johnson
          Katherine Johnson (DC Bar No. 497321)
          kjohnson3@ftc.gov
          Federal Trade Commission
          600 Pennsylvania Ave. NW, CC-9528
          Washington, DC 20580
          Tel:  (202) 326-2185

          Thomas Syta, Cal. Bar No. 116286
          tsyta@ftc.gov
          FEDERAL TRADE COMMISSION
          10877 Wilshire Blvd., Suite 700
          Los Angeles, CA 90024
          Tel: (310) 824-4343; Fax:  (310) 824-4380

          Attorneys for Plaintiff
          FEDERAL TRADE COMMISSION